IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Submitted on Briefs on November 15, 2013

## IN THE MATTER OF T.R.Y.

**Appeal from the Davidson County Juvenile Court**
**No. 2010-3303   Alan Calhoun, Juvenile Magistrate**

_____

**No. M2012-01343-COA-R3-JV - Filed February 12, 2014**

_____

This appeal involves the modification of a parenting arrangement. After many years without parenting time, the mother asked the juvenile court to designate her as the primary residential parent for the parties' daughter. The juvenile court held domestic violence in the father's home constituted a material change in circumstances. However, the juvenile court concluded that, despite the incidents of domestic violence, it was in the daughter's best interest for the father to remain as the primary residential parent. The juvenile court awarded the mother alternate residential parenting time. The mother appeals, raising numerous issues. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is Affirmed**

HOLLY M. KIRBY, J., delivered the Opinion of the Court, in which ALAN E. HIGHERS, P.J. W.S., and J. STEVEN STAFFORD, J., joined.

Petitioner/Appellant K.B., Lansing, MI, self-represented.

David B. Lyons, Nashville, TN for Respondent/Appellee E.Y.[1]

### OPINION

#### FACTS AND PROCEEDINGS BELOW

This is the second appeal in this case. *See Byars v. Young*, 327 S.W.3d 42, 46-47 (Tenn. Ct. App. 2010). In 1999, the child at issue, T.R.Y. ("Daughter"), was born to Petitioner/Appellant K.B. ("Mother") and Respondent/Appellee E.Y. ("Father"). Mother and Father were never married to each other.

_____

[1]In July 2013, before this appeal was submitted on brief, Mr. Lyons passed away.

In 2001, Mother filed a petition in the Shelby County Juvenile Court to establish Father as Daughter's biological parent. That same year, the juvenile court granted Mother's petition and entered an order holding that Father is Daughter's father. The juvenile court designated Mother as the primary residential parent and awarded Father unsupervised alternate residential parenting time.

Shortly thereafter, disputes arose. When Daughter was still very young, Mother witnessed conduct by Father that she believed to be sexual abuse of her infant son. Consequently, she refused to comply with the juvenile court order allowing Father unsupervised parenting time with Daughter. At some point, the Tennessee Department of Children's Services ("DCS") investigated Mother's sexual abuse allegations against Father and determined that they were unfounded. Despite this, Mother refused to comply with the juvenile court order permitting Father unsupervised parenting time with Daughter. As a result, the Shelby County Juvenile Court found Mother in contempt of court and awarded Father temporary custody. After some time, the juvenile court returned temporary custody to Mother, ordered the family to undergo counseling, and appointed a guardian ad litem for Daughter.

In December 2002, when Daughter was three years old, Mother claimed that Daughter returned from residential parenting time with Father and told Mother that Father had fondled her. This prompted an additional DCS investigation. Eventually, DCS determined that these allegations of sexual abuse were unfounded as well. Despite the DCS conclusion, Mother persisted in labeling Father as a sexual predator and refused to allow Father parenting time with Daughter unless it was supervised.

This prompted several contempt petitions as well as petitions for modification of the parties' parenting arrangement. In June 2003, Shelby County Juvenile Court Referee Cary Woods held a hearing on the pending petitions. The juvenile court found that Mother had persistently refused to comply with previous orders on parenting time and had refused to cooperate with the guardian ad litem. Mother's conduct of "continually labeling [Father] as a sexual predator," the juvenile court found, constituted a material change in circumstances that created a risk of substantial harm to Daughter. It held that a change in the parties' parenting arrangement was in Daughter's best interest. The juvenile court concluded that Mother's "conduct of persistent refusal to comply with the Court's orders evidences an aggressively defiant attitude toward [Father] and that [Father] should be awarded permanent and exclusive custody."

In its order permanently designating Father as primary residential parent, the Shelby County Juvenile Court failed to provide for any sort of parenting time for Mother. Mother then filed a pro se "Notice of Appeal" with the Shelby County Circuit Court. The matter was assigned

to Circuit Court Judge Kay Robilio. As detailed in our opinion in the first appeal, years of fruitless proceedings ensued in the Shelby County Circuit Court, during which no one questioned the circuit court's subject matter jurisdiction to hear the appeal from the juvenile court.

Finally, several years later in 2008, the matter was transferred to a different circuit court judge, who realized that the circuit court was without jurisdiction to hear Mother's appeal and that "appellate jurisdiction more appropriately rests with the Court of Appeals." As detailed in our prior opinion, Mother's appeal was eventually transferred to this Court.

In May 2010, this Court issued its opinion, holding that the proceedings in the Shelby County Circuit Court were void for lack of subject matter jurisdiction. *Byars v. Young*, 327 S.W.3d 42, 46-47 (Tenn. Ct. App. 2010). The appellate court then reviewed the parenting arrangement as set forth in the 2003 order of the Shelby County Juvenile Court. *Id.* at 48. The appellate court affirmed the designation of Father as the child's primary residential parent. *Id.* at 50. However, the appellate court noted pointedly that it was "unacceptable" for the juvenile court to have failed to provide any parenting time for Mother, for no apparent reason, and for the situation to linger in the circuit court, leaving Mother without parenting time with Daughter for some seven years. *Id.* at 51. The appellate court remanded the matter back to the Shelby County Juvenile Court for "consideration and implementation of appropriate measures to reestablish the relationship of the parties' child with Mother." *Id.* at 52-53.

However, by the time the appellate court remanded the case, Father and Daughter had moved to Davidson County, Tennessee. Additionally, at some point, Mother moved to Lansing, Michigan, where she currently resides. Consequently, instead of ordering parenting time for Mother, in June 2010, the Shelby County Juvenile Court transferred the matter to the Davidson County Juvenile Court ("trial court"). After the transfer, several more months went by without implementation of a parenting order that provided for any sort of parenting time for Mother.

In January 2011, Mother filed a *pro se* petition in the Davidson County Juvenile Court alleging that Daughter was dependent and neglected in Father's care. Mother's petition asserted that Father had been involved in numerous domestic violence incidents in the presence of Daughter and that Father's wife had obtained an order of protection against him. In response to Mother's petition, the trial court ordered DCS to investigate the allegations of domestic violence against Father and appointed another guardian ad litem for Daughter.

In February 2011, Father filed a motion to dismiss Mother's dependency and neglect petition. He did not deny a physical altercation with his wife, but claimed that Daughter was not

present during the incident and was in no way affected by it. When Mother failed to appear at the trial court's May 2011 hearing on her petition, the trial court dismissed her petition without prejudice.[2]

On October 6, 2011, Mother filed another *pro se* dependency and neglect petition. This one asserted that Father was incarcerated and unable to care for Daughter. It also alleged that Father had friends who used illegal drugs and that Father, a veteran, walked around his home saying that he was "ready to go to war and die." Mother's request for an emergency protective order was denied.

The next day, the trial court ordered another DCS investigation and reappointed the guardian ad litem for Daughter. In the resulting DCS investigation, a DCS worker interviewed Daughter at Father's home and separately interviewed Father while he was incarcerated at the Davidson County Jail. DCS submitted its report on the investigation to the trial court on October 11, 2011. The report said that Father was incarcerated as a "weekender" for violation of the order of protection obtained by his wife, but Father's children, including Daughter, were unaware of his incarceration and their daily activities continued as normal.

The report described Daughter as a "very bright and articulate young girl" who appeared well-nourished, appropriately dressed, neat and clean. It noted that she is "an honor roll student" who "loves to read books." DCS reported that Daughter told the investigator that Father had never been violent towards either Daughter or her brother, and to her knowledge, he had never participated in illegal drugs.

The DCS report described Father as "friendly and cooperative." According to the DCS report, Father conceded that an incident of domestic violence with his wife had occurred. Father explained that his wife smoked marijuana in his home; this prompted Father to put his hands on her in the bathroom one evening. He claimed that the children were not home during this altercation. After this altercation, Father's wife obtained an order of protection against Father. Father told the DCS investigator that he violated the order of protection by contacting his wife's mother to attempt to explain the domestic violence incident; for this violation, he was placed on probation. After Father was placed on probation, he claimed, his son accidently sent a blank text to Father's wife from Father's cell phone. This constituted a violation of Father's probation, so Father was sentenced to 20 days in jail, to be served on Father's days off from work. Regarding Mother's allegations of drug abuse, the DCS report noted that Father tested negative for all drugs.

---

[2]Mother filed a motion for a continuance of the hearing; her motion was denied.

The DCS report stated that Father had been employed by the U.S. Postal Service for approximately 12 years. It described Father's home as "adequately furnished, neat and organized."

After receiving the DCS report, the trial court held a hearing on Mother's second dependency and neglect petition in December 2011. The trial court held that Mother had not carried her burden of proving that Daughter was dependent and neglected. However, it finally entered an order granting Mother unsupervised parenting time. Because Mother was living in Michigan, the trial court order provided for Mother's parenting time with Daughter to take place at Mother's sister's home in Mississippi from December 26, 2011 until January 2, 2012. The trial court order indicated that the trial judge intended to transition gradually to a more standard parenting time arrangement. Noting that Mother had filed a motion to modify the parenting arrangement to designate her as the primary residential parent,[3] the trial court set a hearing on this motion for February 2012, ordered Father to obtain counseling for Daughter, and ordered a courtesy home study for Mother's Michigan residence.

On February 17, 2012, the trial court held a hearing on Mother's parenting time. At the hearing, the trial court ordered additional parenting time for Mother, including provisions for holidays, school breaks, and summers. It scheduled an evidentiary hearing on April 13, 2012 for Mother's request to be designated primary residential parent.

The trial court held the evidentiary hearing as scheduled on April 13, 2012. At this hearing, the trial court heard testimony from Father's soon-to-be ex-wife ("Ex-Wife"), as well as testimony from both Father and Mother.

Ex-Wife testified that, during her marriage to Father, she was primarily responsible for the care of Daughter and the other children in the household because Father worked a night shift and slept during the day. Father and Ex-Wife married in approximately 2007 and Ex-Wife moved out of the home shortly after the marriage began. She returned to Father's home in 2009. Ex-Wife said that while she lived in Father's home, Daughter was a straight-A student and had perfect school attendance.

In her testimony, Ex-Wife described a volatile relationship with Father. On five separate occasions, Ex-Wife claimed, Father was physically violent toward her, but she dropped the charges against him. She said that she finally obtained an order of protection against Father after an incident in which she got out of the shower and Father grabbed her throat and knocked her head against the wall. Ex-Wife testified that Father violated the order of protection and was sentenced to 20 days of incarceration, to be served on his days off from work. Ex-Wife

_____

[3]The appellate record does not contain a copy of Mother's motion.

corroborated Father's assertion that none of the children were present during any of the physical altercations between Ex-Wife and Father. As to Father's relationship with Daughter, Ex-Wife said, she saw Father grab Daughter's shirt on one occasion and she had seen Father yell at Daughter and then apologize.

In his testimony, Father did not dispute the physical altercation in the bathroom that Ex-Wife described to the trial court. He explained, however, that the altercation occurred because Ex-Wife had smoked marijuana in their home and Father had been clear "there would be no drug use in that household, period." Ex-Wife's occasional drug use finally prompted Father to decide that Ex-Wife would no longer be in his and Daughter's lives. After the bathroom incident, Father conceded, Ex-Wife obtained an order of protection against him, and he was later incarcerated for violation of probation because he called his ex-mother-in-law and his son inadvertently sent Ex-Wife a blank text. Father again asserted that Daughter never saw a physical altercation between himself and Ex-Wife. He denied Ex-Wife's assertion that he grabbed Daughter's shirt.

Father conceded that Daughter did not see Mother for many years. He pointed out, however, that Daughter had maintained a relationship with her maternal grandmother, Mother's mother. Father claimed that he would not have opposed court-ordered parenting time for Mother but felt that a court order was needed in light of Mother's "attitude and the way [she] conduct[s] [herself] in the matter." He asserted that "it would be in the best interest of everyone [that] [w]e have some written document in place holding [Mother] responsible for [her] actions."

Father recounted an argument with Mother in April 2012, two weeks before the hearing, at the exchange for Mother's parenting time. On Friday, March 30, Father and Daughter were in Memphis to visit family. Mother was in Memphis at the same time and asked to pick Daughter up in Memphis a day early, rather than the next day in Nashville, as ordered by the trial court. Father said he permitted this even though Daughter had not packed clothes for the visit with Mother in Michigan. Apparently there was a misunderstanding about whether Mother or Father would buy Daughter clothes for the Michigan visit. After it became clear that Mother would not buy additional clothes, Daughter "wanted to go home [to Nashville] and get her clothes." According to Father, Mother then proceeded to drive Daughter to Father's home in Nashville without telling Father in advance. Father was at home when the two arrived unannounced and a confrontation between the parents occurred. During the incident, Father testified, he overheard Mother tell Daughter that Father was a "crazy MF."

Father's testimony included an outline of Daughter's routine at Father's home. When he goes to work 8:30 p.m., Father said, the children are cared for by Ms. Campbell, who had been the children's babysitter for approximately a year. Father testified that, when he gets home from the night shift at 7 a.m., he eats breakfast with Daughter and his son and takes both of them

to the bus stop. Father testified that Daughter has straight As and perfect attendance in school, that she received eight awards at the end of the previous school year, and that she had no disciplinary issues at home. Father also testified that Mother was approximately $12,000 behind in her child support payments. Father acknowledged an open container violation while he was on probation and also conceded that the violation was not reported to his probation officer; Father asserted that the open beer can belonged to a friend.

The trial court heard testimony from Mother as well. Mother told the trial court that, over the past nine years, she had had no regular parenting time with Daughter because the Juvenile Court's order failed to address her parenting time. Mother expressed her belief that the Juvenile Court's action was part of a conspiracy to keep her away from Daughter.

Mother's testimony generally correlated with Father's on the confrontation between the parents during the exchange for Mother's April 2012 parenting time. Mother testified about her version of the misunderstanding as to whether Mother or Father would buy Daughter clothes for her parenting time with Mother in Michigan. Since Daughter did not have enough appropriate clothes with her, Mother decided to drive Daughter to Father's home in Nashville to get clothes that Daughter already owned.

Upon their arrival at Father's home, Mother said, Father was upset with Daughter. Mother claimed that, referring to Mother, Father asked Daughter, "Why did you bring that girl here?" Mother said that she then told Father that if he were going to be mad at anyone, he should be mad at Mother instead of Daughter. Reacting to Daughter's "stark look" after this confrontation, Mother said, she asked Daughter if she was okay. Mother admitted that she then told Daughter: "I was like, yeah, he's crazy. Yeah, he's crazy don't worry about him." Mother denied that she told Daughter that Father is a "crazy MF" but confirmed that she nevertheless believes that "he is a crazy MF."

On cross examination, Mother acknowledged that she was incarcerated twice for violating court orders. She was unapologetic for her actions, however, and said that she was only "trying to protect my children. I have a right and a responsibility to do that." Mother also conceded that, in the past, she made allegations of sexual abuse against Father, and that the resulting psychological evaluations concluded that there was no indication of sexual abuse by Father. Mother indicated that she was unconvinced; she asserted that the four different judges who had been assigned to her case have "a God complex," noted that the psychological examinations were "ordered by the court," and claimed that she had personally seen Father molest her infant son through his diaper. She was critical of the efforts to keep her from having parenting time with Daughter.

Mother acknowledged that she had no evidence that Daughter had witnessed any of the physical altercations between Father and Ex-Wife or that Daughter had seen Ex-Wife smoke marijuana in Father's home. She stated, however, that just because Daughter had not witnessed such behavior "doesn't mean that she doesn't know that it's happening." Mother emphasized that she wants to raise Daughter. That concluded the testimony at the hearing.

At the conclusion of the hearing, the trial court issued an oral ruling.[4] The trial court recited Ex-Wife's testimony that Father had been physically abusive to her on five occasions, including the August 2010 incident in the bathroom and other incidents in which he knocked her tooth out and punched her in the face. It noted that Father conceded that he put his hands on Ex-Wife's throat but denied hitting her. The trial court noted that both Ex-Wife and Father testified that none of the physical confrontations between Father and Ex-Wife occurred in Daughter's presence. The trial court recounted the testimony on Father's violation of the protection order, his subsequent incarceration, and his open container violation, noting in particular that the open container violation occurred "during the afternoon, shortly before [Father] would normally pick [Daughter] up."

The trial court found that Mother's accusations of perjury and deceit by Father did not warrant a finding of a material change in circumstances. It noted, however, that Mother continued to accuse Father of sexually abusing Daughter, despite investigations that concluded to the contrary, and that Mother maintained an "aggressively defiant attitude" toward Father. Overall, the trial court held that the "confluence of events" that it had recounted constituted a material change in circumstances. Moreover, it said, the fact that the Shelby County Juvenile Court's order resulted in Daughter being "deprived of her mother's care and attention" for an almost nine-year period "affected [Daughter's] well-being in a meaningful way." Accordingly, the trial court undertook to do a comparative fitness analysis for the purpose of considering whether a modification of the parties' parenting arrangement was in Daughter's best interest.

The trial court observed first that, while Ex-Wife lived in Father's home, she functioned as Daughter's primary caregiver, and during those periods, Father "did not frequently participate in parenting." The trial court also noted that, during the exchange for Mother's parenting time shortly before the hearing, both parents "acted foolishly [and] demonstrated to the Court just how fractured these two parents are." The trial court continued its comparative fitness analysis:

---

[4] The guardian ad litem put on no proof during the hearing. She said that Daughter's parenting time with Mother had generally gone well but emphasized that Daughter disliked "being caught in the crossfire between the two parents."

-8-

[Father] has been [Daughter's] primary caretaker since 2003. From all the proof presented, she is thriving at home. She is a straight A student with perfect attendance, an accomplishment she has maintained for several years. [Father] has a good employment record. With essentially no support from [Mother], he has provided for [Daughter's] care and health for years. He acknowledged being on an anti-anxiety medication and anti-depressants while on probation but stated that he no longer needs the medication and hence doesn't take it. His relationship with [Ex-Wife] was obviously volatile and it appears to the Court that he was violent on more than one occasion toward her. Fortunately, [Daughter] was not present for this nor was any proof entered that he has engaged in such conduct towards her or that she was even aware of his conduct with [Ex-Wife].

[Mother] has had little opportunity to demonstrate her parenting ability one way or the other. She raised in Court an equity argument essentially stating that because [Father] has had virtually exclusive possession of their daughter for years, it is now her time to take the lead. She is employed. The Court attempted to use CASA to conduct a courtesy home visit upon her home in Michigan but CASA was unable to do so. In [the] absence of proof to the contrary, the Court will therefore assume that her home is appropriate. As noted above, [Mother] has not been a primary caretaker to her daughter for years. She visited with her daughter over spring vacation from school and that visit evidently went well.

Most concerning to the Court is [Mother's] insistence that [Father] sexually molested [Daughter], an allegation previously unfounded. Furthermore, [Mother] implies that the Courts, including this Court, have engaged in some sort of conspiracy to keep her daughter from her. In the opinion of this Court, these beliefs demonstrate that [Mother] will neither facilitate nor encourage a close parent-child relationship between [Daughter] and her father. In fact, most recently she called him a "crazy mf" in front of her daughter. This venom mirrors the circumstances found by Referee Cary Woods [Shelby County Juvenile Court referee] in 2003. In large part, it appears to this Court that little has changed. Given these circumstances coupled with the fact that [Daughter] is prospering in her current environment, the Court does not believe that the evidence supports a change of custody.

Based on these findings, the trial court declined to change the designation of primary residential parent but modified the parties' parenting arrangement to provide for substantial parenting time for Mother. The trial court's order detailed how and where the parenting time exchanges were to occur and stated that supervision of Mother's parenting time "is not

mandatory and should be avoided unless Mother's conduct makes it necessary." Mother now appeals.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Mother raises fifteen issues for our consideration:

1. Whether the Shelby County Juvenile Court should have changed venue before applying a direct order from the Appellant Court to grant visitation when the cause was remanded.

2. Does the law or Court have a remedy for appellee committing fraud upon the court to defraud the mother custody of her child for nine years?

3. Does the Davidson County Juvenile Court have the legal standing to deny visitation to a natural parent when there is no legal reason to do so and contrary to the Appell[ate] Court of Tennessee's Order?

4. Whether the evidence presented at trial was sufficient to warrant a finding that kept custody with the father and whether it was in the best interest of the child?

5. Whether the evidence stated to keep custody with the father met the burden of proof at the clear and convincing standard, which must be supported by a preponderance of the evidence?

6. Whether Davidson County Juvenile Court and DCS with their two poorly uninvestigated [sic], false report findings of unfounded which [were] made part of custody proceedings [were] unconstitutional?

7. Whether Davidson County Juvenile Court erred in accepting the change of venue without abiding by the standing Appell[ate] Court order to grant visitation?

8. Whether Davidson County Juvenile Court erred in not changing custody when a substantial material change had occurred.

9. When material changes been established to change custody, does a comparative fitness examination then have to be considered? If so, why was one not conducted initially to keep the child with her mother?

-10-

10. Whether the Juvenile court have a legal standing to insist the plaintiff believe that which is not true.

11. Whether the plaintiff's beliefs about what her daughter stated to her grounds for keeping custody from the plaintiff.

12. Whether Juvenile Court has a legal duty to use negative evidence that has been proven in court against the defendant.

13. Whether the Appell[ate] Court has jurisdiction to impose penalty and sanctions when the plaintiff proves conspiracy, bias, and contempt from the courts in dealing with her and her daughter.

14. When domestic violence has been proven to have occurred in a household, does it have to then be proven that the children were individually affected by its occurrence in order to change custody?

15. If res judicata has been raised and granted about a particular time frame, how can it then be asked of by that attorney and then included into the new reasoning as derogative toward the plaintiff by the judge, if those issues were not to be litigated in the new case?

In addition, Father argues on appeal that the trial court erred in finding a material change in circumstances. However, in his appellate brief, Father does not state this as an issue in the "Statement of the Issues" section of his brief. We have often held that, where a party does not include an issue in the "Statement of the Issues" section of his appellate brief, the issue is waived, even if the party argues the issue in the "Argument" section of the brief. *See Rutherford v. Rutherford*, No. M2012-01807-COA-R3-CV, 2013 WL 1928542, at *4 n. 5 (Tenn. Ct. App. May 7, 2013); *Bunch v. Bunch*, 281 S.W.3d 406, 410 (Tenn. Ct. App. 2008). Therefore, we respectfully decline to address this issue on appeal.

We review the trial court's factual findings *de novo* on the record, with a presumption of correctness, unless the evidence preponderates to the contrary. *See* Tenn. R. App. P. 13(d). The trial court's conclusions of law are reviewed *de novo*, with no presumption of correctness. *See Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000); *Earls v. Mendoza*, No. W2010-01878-COA-R3-CV, 2011 WL 3481007, at *5 (Tenn. Ct. App. Aug. 10, 2011).

The trial court is in the best position to evaluate the credibility of witnesses because it can observe the demeanor of the witnesses as they testify. *Davis v. Davis*, 223 S.W.3d 233, 238 (Tenn. Ct. App. 2006). Consequently, we accord particular deference to the trial court's

findings of fact that are based on its assessment of the credibility of the witnesses. ***Davis***, 223 S.W.3d at 238 (citing ***ARC LifeMed, Inc. v. AMC-Tennessee, Inc.***, 183 S.W.3d 1, 24 (Tenn. Ct. App. 2005)). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." ***Wells v. Tenn. Bd. of Regents***, 9 S.W.3d 779, 783 (Tenn. 1999).

## ANALYSIS

As set forth below, as to a number of the issues Mother raises on appeal, we either decline to address them or conclude that they are without merit. However, we consider Issues 4, 5, 8 and 14 together in some detail, as all argue that the trial court erred in leaving intact the designation of Father as the primary residential parent.

In Issue 1, Mother argues that after this Court remanded the matter, she should have been awarded parenting time by the Shelby County Juvenile Court prior to the transfer to Davidson County. Conversely, in Issue 7, Mother argues that the Davidson County Juvenile Court erred in accepting the change of venue without first ordering parenting time for her, pursuant to this Court's order on remand. While we can appreciate Mother's logic, if a transfer was called for because neither party resided in Shelby County, then we cannot say that the Shelby County Juvenile Court erred in declining to grant Mother parenting time prior to the transfer. Likewise, the Davidson County Juvenile Court did not err in accepting the transfer from Shelby County prior to implementation of parenting time for Mother.

In Issue 2, Mother argues that Father should be sanctioned for committing fraud upon the court for depriving her of parenting time with Daughter for nine years. Similarly, in Issue 13, Mother argues that this Court had jurisdiction to impose penalties and sanctions when the plaintiff proves conspiracy, bias, and contempt from the courts in dealing with her and Daughter. As we observed in the first appeal in this case, Mother has ample reason to be upset that she was given no parenting time with Daughter for many years. However, although Mother alleged fraud, conspiracy, bias, and other such wrongdoing, there was no *evidence* in the trial court below that the failure to order parenting time for Mother was the result of fraud, conspiracy, or bias, and the Davidson County Juvenile Court below made no finding that the ruling of the Shelby County Juvenile Court was the result of fraud, conspiracy, or bias. In the absence of any finding of fraud, conspiracy, or bias or any evidence of such, we must respectfully decline to address these issues.

In Issue 3, Mother argues the Davidson County Juvenile Court does not have legal standing to deny parenting time to a natural parent when there is no legal reason to do so and it is contrary to this Court's order. Because litigants have "standing" and a court has "jurisdiction," we perceive this issue as questioning the jurisdiction of the Davidson County Juvenile Court.

-12-

In the first appeal in this case, this Court addressed the Shelby County Juvenile Court's failure to provide for any parenting time for Mother. Once the matter was remanded and then transferred to the Davidson County Juvenile Court, that court granted Mother substantial parenting time. Therefore, we must conclude that the premise of this issue is erroneous and so hold that the issue is without merit.

In Issue 6, Mother argues that the investigations performed by the Davidson County Juvenile Court and DCS were "poorly uninvestigated, false report findings of unfounded" and unconstitutional. While it is clear from this issue that Mother is critical of the DCS investigations of her allegations against Father and critical of the Davidson County Juvenile Court as well for relying on the results of the investigations, she fails to explain how the actions of either DCS or the trial court violated her constitutional rights or even identify what constitutional rights were allegedly violated. Therefore, we must respectfully decline to address this issue.

In Issue 9, Mother argues that when a material change in circumstances is established, a comparative fitness examination is necessary and contends that one was not initially performed. We interpret this issue as arguing that the Shelby County Juvenile Court erred in its 2003 order designating Father as the primary residential parent. In the first appeal in this case, this Court affirmed the Shelby County Juvenile Court's designation of Father as the primary residential parent. We are precluded from considering the same issue again in this second appeal, under the "law of the case" doctrine:

> The phrase "law of the case" refers to a legal doctrine which generally prohibits reconsideration of issues that have already been decided in a prior appeal of the same case. In other words, under the law of the case doctrine, an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal. The doctrine applies to issues that were actually before the appellate court in the first appeal and to issues that were necessarily decided by implication.

*See Memphis Pub. Co. v. Tennessee Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998) (citations omitted). Therefore, we must respectfully decline to consider this issue.

Issues 10, 11 and 12 are confusing and unintelligible. As such, we must respectfully decline to address them. All of these issues involve Mother's continued belief that Father sexually abused their daughter; this was discussed in the first appeal and is part of our analysis below on the actions of the Davidson County Juvenile Court.

In Issue 15, Mother argues that the Davidson County Juvenile Court erred in considering the decision of the Shelby County Juvenile Court to be *res judicata.* Most often, the term *res judicata* is used when the issue involves two lawsuits: "The doctrine of res judicata, also referred to as claim preclusion, bars a second suit between the same parties or their privies on the same cause of action with respect to all issues which were or could have been litigated in the former suit." *Creech v. Addington*, 281 S.W.3d 363, 376 (Tenn. 2009) (citing *Massengill v. Scott*, 738 S.W.2d 629, 631 (Tenn. 1987)). However, in this context, the term is used "in its general sense to mean ' 'a matter adjudged; a thing judicially acted upon or decided.' ' " *In re Shyronne D. H.,* No. W2011-00328-COA-R3-PT, 2011 WL 2651097, at *5 n. 14 (Tenn. Ct. App. July 7, 2011) (citing *Richardson v. Tenn. Bd. of Dentistry*, 913 S.W.2d 446, 459 n. 11 (Tenn. 1995) (quoting Black's Law Dictionary 1174 (5th ed. 1979))). We discuss the application of *res judicata* further below in our discussion of the trial court's refusal to designate Mother as the child's primary residential parent. As to this issue, from our review of the record, it appears that the Davidson County Juvenile Court properly considered the ruling of the Shelby County Juvenile Court, designating Father as the primary residential parent, to be final as affirmed by this Court in the first appeal, and that the Davidson County Juvenile Court did not consider the Shelby County Circuit Court proceedings that were voided by this Court in the first appeal. Therefore, we must conclude that this argument is without merit.

We now address Mother's main contention, that the trial court erred in leaving Father as Daughter's primary residential parent. Parenting decisions are among the most important faced by the courts. *Wall v. Wall*, No. W2010-01069-COA-R3-CV, 2011 WL 2732269, at *21; 2011 Tenn. App. LEXIS 385, at *64 (Tenn. Ct. App. July 14, 2011) (citing *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001)); *see also Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996). Decisions on parenting arrangements "should be directed towards promoting the child's best interest by placing [her] in an environment that will best serve [her] physical and emotional needs." *In re T.C.D.*, 261 S.W.3d 734, 742-43 (Tenn. Ct. App. 2007). Courts strive to devise a parenting arrangement that promotes the development of the child's relationship with both parents and interferes as little as possible with family decision-making. *See Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn. 1996); *Taylor v. Taylor*, 849 S.W.2d 319, 331-32 (Tenn. 1993); *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 484 (Tenn. Ct. App. 1997).

When presented with a request to modify a parenting arrangement, the existing parenting order is considered *res judicata* on the facts as they existed at the time the most recent order was entered. *See Rigsby v. Edmonds*, 395 S.W.3d 728, 735 (Tenn. Ct. App. 2012) (citing *Steen*, 61 S.W.3d at 327). However, "Tennessee courts are statutorily authorized to modify custody arrangements as necessitated by intervening changes in circumstances" and "retain[ ] control over the custody of a minor child and may make such changes in the custody order as the

exigencies of the case may require." ***Conner v. Conner***, No. W2007-01711-COA-R3-CV, 2008 WL 2219255, at \*2; 2008 Tenn. App. LEXIS 320, at \*6 (Tenn. Ct. App. May 29, 2008); ***Steen***, 61 S.W.3d at 327 (citing ***Adelsperger***, 970 S.W.2d at 485). The Tennessee statute governing the modification of an existing parenting arrangement provides:

> If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. . . . A material change in circumstance may include, but is not limited to, . . . circumstances that make the parenting plan no longer in the best interest of the child.

Tenn. Code Ann. § 36-6-101(a)(2)(B)(2013).

Thus, in order to modify an existing parenting arrangement, the parent who seeks to change the designation of the primary residential parent first must prove the requisite material change in circumstances. ***See*** Tenn. Code Ann. § 36-6-101(a)(2)(B)(2013); ***Taylor v. McKinnie***, No. W2007-01468-COA-R3-JV, 2008 WL 2971767, at \*3 (Tenn. Ct. App. Aug. 5, 2008) (citing ***Kendrick v. Shoemake,*** 90 S.W.3d 566, 570 (Tenn. 2002)); ***see also Boyer v. Heimermann***, 238 S.W.3d 249, 259 (Tenn. Ct. App. 2007) (citing ***Krupp v. Cunningham-Grogan***, No. M2005-01098-COA-R3-CV, 2006 WL 2505037, at \*7 (Tenn. Ct. App. Aug. 29, 2006)). If the trial court finds a material change in circumstances, it is then tasked with ascertaining whether a change in the designation of primary residential parent is in the child's best interest, considering the factors in Tennessee Code Annotated § 36-6-106(a). ***See Wall***, 2011 WL 2732269, at \*24, 2011 Tenn. App. LEXIS 385, at \*73 (citing ***Boyer***, 238 S.W.3d at 259). "If a material change in circumstances has occurred, then the best interest analysis becomes mandatory." ***Boyer***, 238 S.W.3d at 259-60 (citing ***Keisling***, 196 S.W.3d at 718). "[A] finding of a material change in circumstances since the entry of the [pre-existing parenting] order does not predetermine the outcome of the best interests analysis." ***In re T.C.D.***, 261 S.W.3d at 746 (citing ***Krupp,*** 2006 WL 2505037, at \* 7). Thus, a finding of a material change in circumstances warranting a re-evaluation of the parenting plan does not necessarily require that any change in visitation be made. ***Id***. The party who seeks to change the designation of primary residential parent must prove by a preponderance of the evidence that the modification would be in the child's best interest. ***In re T.C.D.,*** 261 S.W.3d at 742; ***Kesterson v. Varner***, 172 S.W.3d 556, 567 (Tenn. Ct. App. 2005). The determination of whether a material change in circumstances has occurred, and whether such a change necessitates a modification of the parenting arrangement, are both questions of fact for the trier of fact. ***Wall***, 2011 WL 2732269, at \*21, 2011 Tenn. App. LEXIS 385, at \*63 (citing ***In re T.C.D.***, 261 S.W.3d at 742).

Overall, trial courts have broad discretion regarding parenting arrangements because such "decisions are factually driven and require the careful consideration of numerous factors." ***In***

*re E.J.M.*, 259 S.W.3d 124, 136 (Tenn. Ct. App. 2007) (citing *Morris v. Morris,* No. M2001-02275-COA-R3-CV, 2002 WL 31059222, at *2 (Tenn. Ct. App. Sept.17, 2002); *Bah v. Bah,* 668 S.W.2d 663, 666 (Tenn. Ct. App. 1983)). *See also Varley v. Varley*, 934 S.W.2d 659, 665 (Tenn. Ct. App. 1996) (quoting *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993)). Accordingly, the appellate court will decline to disturb the parenting plan fashioned by the trial court unless the trial court's decision was based on a material error of law or the evidence preponderates against it. *See In re T.C.D.*, 261 S.W.3d at 742 (citing *Adelsperger*, 970 S.W.2d at 485). Similarly, a trial court's decision on a parenting plan should be set aside only when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *In re T.C.D.*, 261 S.W.3d at 742 (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001)).

As noted above, the trial court's finding of a material change in circumstances in this case has not been properly raised as an issue on appeal. "A finding that a material change in circumstances has occurred is a threshold inquiry that, when made, allows the court to proceed to make a fresh determination of the best interest of the child." *Richards v. Richards*, No. E2010-00521-COA-R3-CV, 2011 WL 2135432, at *6 (Tenn. Ct. App. May 31, 2011) (citing *Kendrick*, 90 S.W.3d at 570). *See Maxwell v. Woodard*, No. M2011-02482-COA-R3-CV, 2013 WL 2420500, at *17 (Tenn. Ct. App. May 31, 2013). Therefore, we consider whether the trial court erred in holding that it was not in Daughter's best interest to designate Mother as the child's primary residential parent.

In order to determine the parenting arrangement that is in best interest of the child at issue, the trial court must engage in a "comparative fitness" analysis as to the parents. *See Gaskill*, 936 S.W.2d at 630. "Fitness for custodial responsibilities is largely a comparative matter. No human being is deemed perfect, hence no human can be deemed a perfectly fit custodian. Necessarily, therefore, the courts must determine which of two or more available custodians is more or less fit than others." *Bah*, 668 S.W.2d at 665-66 (quoting *Edwards v. Edwards,* 501 S.W.2d 283, 290-91 (Tenn. Ct. App. 1973)). "There are literally thousands of things that must be taken into consideration" in making a comparative fitness determination. *Bah*, 668 S.W.2d at 666.

Tennessee Code Annotated § 36-6-106 sets forth numerous factors for the trial court to consider in determining a parenting arrangement:

> (a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum

participation possible in the life of the child consistent with the factors set out in subdivisions (a)(1)-(10), the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:

(1) The love, affection and emotional ties existing between the parents or caregivers and the child;

(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that, where there is a finding, under subdivision (a)(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a nonperpetrating parent or caregiver has relocated in order to flee the perpetrating parent, that the relocation shall not weigh against an award of custody;

(4) The stability of the family unit of the parents or caregivers;

(5) The mental and physical health of the parents or caregivers. The court may, when it deems appropriate, order an examination of a party pursuant to Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party pursuant to § 33-3-105(3). The court order required by § 33-3-105(3) shall contain a qualified protective order that, at a minimum, expressly limits the dissemination of confidential protected mental health information for the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings.

(6) The home, school and community record of the child;

(7)(A) The reasonable preference of the child, if twelve (12) years of age or older;

(B) The court may hear the preference of a younger child on request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that, where there are allegations that one (1) parent has committed child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected to the evidence. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

(10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order.

Tenn. Code Ann. § 36-6-106 (a).

From our review of the record, it appears that the trial court below carefully considered the proof in this case in light of the statutory factors and weighed the evidence as to the strengths and weaknesses of both parents. The trial court rightly took into account the domestic violence in Father's home that Mother emphasizes in her appellate brief. Abuse or violence in the home is greatly concerning, and the trial court's oral ruling makes it clear that the trial court looked carefully at the evidence on this point. The trial court also noted, however, that there was no proof that Daughter was affected by the incidents or even aware of them. While Mother correctly argues that the domestic violence is cause for the Court's concern regardless of whether Daughter witnessed it, the record shows clearly that the trial court carefully weighed the possible effect on Daughter of Father's potential for domestic violence, apart from whether Daughter witnessed the incidents with Ex-Wife.

The trial court also recognized Mother's "equity" argument, her contention that because Father had had "virtually exclusive possession of their daughter for a number of years, it is now her time to take the lead." While Mother's feeling is understandable given the indefensible failure of the Shelby County courts to provide for any parenting time for Mother whatsoever for a period of years, the trial court wisely turned aside this argument. In parenting decisions, the needs of the children are predominant; the desires of the parents are secondary. *In re T.C.D.,* 261 S.W.3d at 742 (citing *Shofner v. Shofner*, 181 S.W.3d 703, 715-16 (Tenn. Ct. App. 2004)). "In making parenting decisions, the court's paramount concern must be the welfare and best interest of the children; parenting decisions must not be made to reward or punish parents." *Irvin v. Irvin*, No. M2011-02424-COA-R3-CV, 2012 WL 5993756, at *14 (Tenn. Ct. App. Nov.30, 2012) (citing *Adelsperger*, 970 S.W.2d at 484-85); *see also In re T.C.D.*, 261 S.W.3d at 742; *Griffin v. Stone*, 834 S.W.2d 300, 302 (Tenn. Ct. App. 1992); *Barnhill v. Barnhill*, 826 S.W.2d 443, 453 (Tenn. Ct. App. 1991).

The trial court's decision appears to be driven primarily by two factors, the tendency of each parent to facilitate the child's relationship with the other parent and continuity for Daughter. On Father's tendency to facilitate and encourage Daughter's relationship with Mother, we are unimpressed with Father's explanation for why he permitted so many years to go by without any parenting time for Mother. However, there is no evidence that he actively obstructed Mother's court-ordered parenting time or made derogatory comments about Mother to Daughter.[5] In contrast, the evidence indicated that Mother referred to Father as a "crazy MF" in Daughter's presence. More important, the trial court rightly expressed concern about Mother's continued insistence that Father molested Daughter, despite the conclusion to the contrary by DCS after more than one investigation. All of this, the trial court found, indicated that Mother's "venom" toward Father as noted by the Shelby County Juvenile Court still existed and did not bode well for a constructive co-parenting relationship with Father. This finding is amply supported by the evidence in the record.

In its decision, the trial court also appeared to rely heavily on the factor of continuity of placement for Daughter. "[C]ontinuity and the parent who has been the child's primary caregiver are often 'powerful considerations' in custody disputes" and courts often "emphasize the importance of continuity in the child's life, and so are normally disinclined to change the original designation . . . [because] children tend to thrive in a stable environment." *Williams v. Singler*, No. W2012-01253-COA-R3-JV, 2013 WL 3927934, at *15 (Tenn. Ct. App. July 31, 2013). In the case at bar, the trial court assumed that Mother's home in Michigan is

---

[5]The only evidence in the record of an untoward comment by Father is his reference to Mother as "that girl" in Daughter's presence.

suitable for Daughter, noted that Mother is employed, and commented that her parenting time with Daughter had gone well. The trial court emphasized, however, that Daughter is "thriving" in Father's home. It observed that Daughter is doing well in her school, on the honor roll, and has had perfect attendance for several years. We note as well that Mother now resides in Michigan, so a change in the designation of primary residential parent would uproot Daughter from her entire life.

From our careful review of the record and consideration of all of the relevant factors, it appears that the trial court directed its decision "towards promoting the child's best interest by placing [her] in an environment that will best serve [her] physical and emotional needs." *In re T.C.D.*, 261 S.W.3d at 742-43. Considering all of the evidence, we find no error in the trial court's conclusion that the evidence did not support designating Mother as Daughter's primary residential parent. We have also reviewed the parenting order entered by the trial court, detailing the arrangements for Mother's parenting time, and affirm it as well.

All other issues raised on appeal are pretermitted by this decision.

## CONCLUSION

The decision of the trial court is affirmed. Costs on appeal are assessed against Appellant K.B, for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE